**IN THE**
**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF ILLINOIS**
**PEORIA DIVISION**

| | |
|---|---|
| JANELLE PASCENTE, | |
|     Plaintiff, | |
| | |
| v. | Case No. 1:13-cv-01520-SLD-JEH |
| | |
| COMMISSIONER OF SOCIAL | |
| SECURITY, | |
|     Defendant. | |

**Order**

Now before the Court is the Plaintiff's, Janelle Pascente's, Motion for Summary Judgment (Doc. 13) and the Commissioner of Social Security's, Carolyn W. Colvin's, Motion for Summary Affirmance (Doc. 16). The Plaintiff appeals from the denial of her application for Social Security Disability Insurance Benefits under Title II of the Social Security Act 42 USC § 405(g) and a Title XVI application for supplemental security income (SSI). This matter has been referred for a Report and Recommendation. Text Order entered March 11, 2014. The Motions are fully briefed, and for the reasons stated herein, the Court recommends that the Commissioner's Motion for Summary Affirmance be GRANTED and the Plaintiff's Motion for Summary Judgment be DENIED. [1]

**I**

On June 15, 2010[2], Pascente filed a Title II application for disability insurance benefits (DIB) and a Title XVI application for supplemental security

---

[1] References to the pages within the Administrative Record will be identified by AR [page number]. The Administrative Record appears as (Doc. 9) and (Doc. 10) on the docket.
[2] While the Administrative Record Court Transcript Index, Disability Report – Field Office – Form SSA – 3367, and the ALJ identify the date as June 1, 2010, the documents appearing in the Administrative Record are dated June 15, 2010.

income (SSI). (AR 165, 173). In her applications, Pascente alleged disability beginning on March 15, 2010. (AR 165, 173). The claims were denied initially on October 6, 2010, and were then denied upon reconsideration on January 18, 2011. (AR 98-101). On February 28, 2011, Pascente filed a timely request for hearing concerning her applications for DIB and SSI. (AR 117-18). An initial hearing was held before the Honorable Diane Raese Flebbe (ALJ) on May 24, 2012[3], during which time Pascente was represented by an attorney. Following the hearing, the ALJ determined that Pascente was not disabled from March 15, 2010 to the date of the ALJ's Decision (July 7, 2012). (AR 35). Pascente's request for review by the Appeals Council was denied on September 13, 2013, making the ALJ's decision the final decision of the Commissioner. (AR 8-14). Pascente filed the instant civil action seeking review of the ALJ's decision on November 1, 2013.

## II

At the time she applied for benefits, Pascente was a 37 year old unmarried woman living with her parents, two children, and boyfriend in Minonk, Illinois. (AR 61, 165, 173). She had completed two years of college and had previously worked as a cook, donut maker, and warehouse supervisor. (AR 74, 224). On her Form SSA-3368, Pascente provided that the conditions that limited her ability to work were osteoarthritis, degenerative arthritis, multiple joint surgeries in legs/arms/shoulder, fibromyalgia, diabetes, and high blood pressure. (AR 206). 2010 was the last time Pascente worked. (AR 49).

At the May 24, 2012 hearing before the ALJ, Pascente testified that in March 2010, at the time she applied for DIB and SSI, she was home after one of her major hernia surgeries and she and her boss talked about how she missed

---

[3] A hearing in front of ALJ Flebbe commenced on March 1, 2012 during which time Pascente was unrepresented. ALJ Flebbe quickly stopped the hearing, after only a handful of questions directed to Pascente, once Pascente clarified that she wanted a continuance of the hearing in order to obtain a representative.

work more than she was there because the surgeries made her sick. (AR 49). Pascente testified that she always had a problem of missing work, the majority of the time because "of the shots and the acute pain more than anything." (AR 50). She testified to getting shots in her knees, shoulders, wrists, and elbows for her pain issues in her joints every six weeks, though two weeks prior to the next shots, "we're back to square one again." (AR 51, 54). After she gets her injections, Pascente testified that she has been told to go home and sit, as the problem is to keep the shot in the particular area. (AR 52). She testified that after at least four days after she gets her shots, she is able to do normal activity. (AR 53). Pascente testified that after the last time she had an injection, she could not move her right, dominant hand for at least four days. (AR 53). Pascente testified to experiencing knee pain at an 8 to 8.5 at the time of the hearing. (AR 55). She testified to pain in her knees and them buckling while using stairs. (AR 56). She testified to walking 50-75 feet and then burning would start, at which time she stops for a few minutes and stands for a second. (AR 57). She testified to being able to lift her arms high enough to brush her hair, and that after a few minutes of using the computer her hands start to cramp up. (AR 58).

She testified that she had high blood pressure, acid reflux, fibromyalgia, osteoporosis, migraines, and recurrent hernias. (AR 62-63). As for the migraines, Pascente testified that she got them at least 3-4 times a month, that they could happen at any time, that she vomited from them, that she has to lay down every time she gets them, and that they were never more than a 9 out of 10 in terms of pain. (AR 63, 64). She testified to going to the hospital twice in the previous year for her migraines, but had not gone at all during the current year (2012). (AR 63). She testified regarding her current medications that naproxen makes her very sick to her stomach, and the Toprol and hydrocodone make her very tired quite

often.  (AR 66).  During the hearing Pascente stood up in order to, as she testified, relieve her pain to a point.  (AR 66).

As for her daily activities, Pascente testified that she did not do a whole lot.  (AR 67).  She would make her own sandwich, she can dress herself, she does not usually drive, she goes out for dinner maybe once or twice a month, she goes to her children's school events (specifically 4-H), she tries to attend church at least once a month, she plays Solitaire on the computer, and she spends at least three hours on the computer per day.  (AR 67-69, 70).  As for work, Pascente testified that she thought the biggest reason she could not work is because she could not withstand the work day, given her legs and her arms.   (AR 69).  Pascente explained that while the records showed that "we" have a farm, that her family just had a few goats, that she did not do the work with the goats, and that the last time she milked the goats was two years before.  (AR 60, 71).  She also explained that she used to mow the lawn (a year earlier was the last time she did so) until she started to have bowel issues.  (AR 61).

After listening to Pascente's testimony, the ALJ posed his first hypothetical question to the vocational expert (VE) Randall Harding (Harding):  whether an individual with the ability to perform light exertion work with occasional climbing ramps and stairs, kneeling, crouching, crawling, occasional reaching overhead, no climbing ladders, ropes, scaffolding, no hazards such as dangerous machinery and unprotected heights, the need to avoid concentrated exposure to extreme cold and light levels, and the need to be at a general office level or less would be able to perform Pascente's past work.  Harding responded that such a person would not be able to perform Pascente's past work.   (AR 76).  Harding testified that, given the aforementioned limitations, the following were representative jobs that could be performed by such a person of Pascente's age, education, and work history:  unskilled light work of router, clerical; routing

clerk; and mail clerk. (AR 76-77). The ALJ's second hypothetical assumed the same restrictions but "dropped [the restrictions] into a sedentary range of work with only occasionally climbing ramps, stairs, kneeling, crouching, crawling, reaching overhead, never climbing ladders, ropes, or scaffolding, no hazards or concentrated exposure to extreme cold, and light levels at general office or less. (AR77). Harding responded that it would still be at the clerical level, specifically: document preparer, unskilled, sedentary; and addressing clerk, unskilled, sedentary. (AR 77). The ALJ's next question further limited the hypotheticals at both the light and sedentary range to frequent but not constant fingering and handling. (AR 77). Harding responded that all positions he previously identified remained: clerk fingering frequently; router occasional fingering and frequent handling; and routing clerk frequently, unskilled sedentary. (AR 77-78). When the ALJ asked whether all of those jobs would be eliminated if reduced to occasional fingering and handling, Harding responded yes, that there would be no other jobs. (AR 78). The ALJ then asked whether the use of a cane impacted the ability to allow for the option to use a cane for ambulation. Harding responded that at the unskilled light level, the use of a cane did eliminate those jobs, and at the unskilled sedentary range the use of a cane would not be an issue if it were used to go to break or to lunch or "something of that nature." (AR 78). Harding testified that based upon his opinion and experience, the individual could miss 0 to 1 days within the first 90 days and then 1 to 1.5 days in subsequent months. The ALJ further questioned whether the individual who gets to work every day, but even at the restricted range of light or sedentary work, the work activities caused increased pain so that the individual needs additional break time of an extra 15 minutes in the morning and 15 minutes in the afternoon to compensate, would eliminate the jobs. Harding responded that based upon his opinion and experience, "[a]t most, employers do allow for an

additional short, however, two additional 15 would be my opinion and eliminate all job positions." (AR 79). The ALJ next questioned the effect of a person's work productivity failing and the person being off task about 20 percent of the day or more due to distraction more and more throughout the day by their increased symptoms of pain and discomfort. Harding responded that, once again based upon his opinion and experience that would eliminate all job positions. (AR 79).

### III

In her 15-page written Decision, the ALJ applied the standard five-step sequential evaluation process and ultimately found that Pascente was not under a disability from March 15, 2010 to the date of the ALJ's decision (July 7, 2012). (AR 35). The ALJ determined that Pascente satisfied Step One because she had not engaged in substantial gainful activity during the period since her alleged onset date of March 15, 2010. (AR 22). At Step Two, the ALJ considered Pascente's alleged disability as a result of the following severe impairments the ALJ determined Pascente to have: fibromyalgia; osteoarthritis; diabetes mellitus; hypertension; obesity; headaches; GERD; degenerative changes of right wrist; status post recurrent hernia repair; status post right shoulder arthroscopy; and vertigo. (AR 22-23). At Step Three, the ALJ found that the medical evidence did not establish that Pascente's impairments met or medically equaled the severity of one of the listed impairments. (AR 23-24). She considered the objective medical evidence to the extent it *failed* to show the necessary items as articulated in the Listings, and the ALJ discussed how evidence suggestive of the items articulated in the Listings still did not establish that Pascente's impairments met or medically equaled the severity of any of the listed impairments. (AR 23-24). Specifically, the ALJ did not find that Pascente met listings 1.02 (Major dysfunction of a joint(s)), 1.04 (Disorders of the spine), 5.00 (Digestive System), 9.08 (Diabetes mellitus), 11.00 (Neurological), and 14.09 (Inflammatory arthritis).

The ALJ found that Pascente had the residual functional capacity (RFC) to perform sedentary work but was limited to work involving only occasional climbing of ramps or stairs, only occasional kneeling, crouching, crawling or overhead reaching, no climbing of ladders, ropes or scaffolds; no exposure to hazards such as dangerous machinery or unprotected heights; limited to frequent but not constant fingering and handling; avoid concentrated exposure to extreme cold; limited to work involving light levels as in a general office setting or less, and limited to work that allows for the option to use a cane.  (AR 25).

In making her RFC determination, the ALJ addressed Pascente's testimony about her multiple hernia surgeries, her ability to ambulate, her leg and knee pain, her shoulder pain, her hypertension and acid reflux, her fibromyalgia and osteoarthritis, her migraines, the bleeding from her rectum, her receipt of injections for pain every six weeks, and the side effects from her medications.  (AR 25).  The ALJ found that Pascente's medically determinable impairments could reasonably be expected to cause the alleged symptoms, but Pascente's statements concerning the intensity, persistence, and limiting effects of those symptoms was not credible to the extent they were inconsistent with the ALJ's RFC assessment.  (AR 25-26).  In reaching that finding, the ALJ considered Pascente's mother's statements and explained why she gave the mother's statements about misunderstanding the Social Security Administration Forms little weight.  (AR 26).  The ALJ also explained that while she considered Pascente's mother's opinions, they were not dispositive as they were not supported by the objective record or by Pascente's actual functioning.  (AR 33).

The ALJ detailed Pascente's medical records dating back to 2008 and going forward through 2012, highlighting Pascente's reports of pain, her reports of problems at different times with her wrists, knees, hands, ankle, shoulders,

fingers, suspected and diagnosed hernias, heart palpitations, vision changes, medication side effects, migraines. (AR 26-33). The ALJ also detailed when Pascente reported improvement of complained-of problems, when she made requests for more injections for the pain, and her reports of the extent to which she stayed active. (AR 26-33). Additionally, the ALJ detailed examination results throughout the 2008-2012 period, specifically noting Pascente's range of motion, grip strength, ambulation, results of MRIs, electrocardiograms, X-rays, and a videonystoamography. (AR 26-33). The ALJ discussed records from treating physicians Dr. Sipe (Pascente's orthopedist), Dr. Lemmert, Dr. Wieland, Dr. Holt (Pascente's primary care physician), and Dr. Radden. (AR 26-33). The ALJ also discussed the disability evaluation done by Dr. Lemmert, the consultative examination done by Dr. Vittal Chapa, a state agency physical evaluation, and a medical assessment of ability to perform work-related activities done by Richard Saylor, PA. (AR 26-33).

At Step Four, the ALJ determined that Pascente was unable to perform any past relevant work. (AR 34).

At Step Five, the ALJ determined that Pascente could perform a significant number of jobs that exist in the national economy. (AR 34). The ALJ considered Pascente's age, education, work experience, and RFC in conjunction with the Medical-Vocational Guidelines 20 CFR Part 404, Subpart P, Appendix 2, and the opinion of VE Harding that a person with Pascente's age, education, work experience, and RFC could perform the jobs of document preparer and addressing clerk. (AR 35). Thus, the ALJ determined that Pascente was not disabled. (AR 35).

## IV

Pascente argues five points: 1) the ALJ committed reversible error by failing to give controlling weight to Pascente's primary treating physician Dr.

Holt, M.D., who concluded she was disabled; 2) the ALJ committed reversible legal error by failing to consider the combination of Pascente's systemic disease with her severe joint degeneration; 3) the ALJ erred by finding Pascente could perform work based on an inadequate RFC; 4) the ALJ erred by failing to adequately analyze the record while assessing Pascente's credibility; and 5) the ALJ erred by discounting Pascente's credibility because she performs some modified activities of daily living. The Commissioner states in her Memorandum in support of her Motion for Summary Affirmance that while Pascente breaks the argument section of her Motion for Summary Judgment into several parts, her claims essentially boil down to two issues: 1) that the ALJ improperly gave little weight to treating physician Dr. Holt's opinion; and 2) Pascente complains about the ALJ's credibility assessment. Because the Court agrees with the Commissioner, the Court will first address Pascente's argument that the ALJ improperly gave little weight to treating physician Dr. Holt's opinion and the Court will then address Pascente's argument that the ALJ erred in his credibility assessment.

Pursuant to 42 USC § 405(g), the Commissioner's findings must be sustained by the Court if they are supported by "substantial evidence." 42 USC § 405(g). The entire administrative record must be reviewed for substantial evidence which is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Skinner v Astrue*, 478 F3d 836, 841 (7th Cir 2007), quoting *Richardson v Perales*, 402 US 389, 401 (1971). The Court may not substitute its judgment for that of the ALJ. *Schmidt v Apfel*, 201 F3d 970, 972 (7th Cir 2000). Furthermore, the Court will not review the credibility determinations of the ALJ unless the determinations lack an explanation or support in the record. *Elder v Astrue*, 529 F3d 408, 413-14 (7th Cir 2008). The ALJ must "sufficiently articulate his assessment of the evidence to assure us that the ALJ

considered the important evidence . . . and to enable us to trace the path of the ALJ's reasoning." *Carlson v Shalala*, 999 F2d 180, 181 (7th Cir 1993).

## A

Pascente first argues that the ALJ committed reversible legal error by failing to give controlling weight to Dr. Holt, her primary treating physician who concluded that she was disabled. Pascente says that Dr. Holt examined her and played a key role coordinating her referrals to specialists for her various impairments on a nearly monthly basis throughout 2011-2012. Thus, Pascente says that Dr. Holt's opinion should be given the utmost deference because it is supported by multiple test results and because his letter (indicating that Pascente is disabled) shows he reviewed the record in light of all the work done by OSF doctors on Pascente's behalf. The Commissioner counters that the ALJ gave several reasons for attributing little weight to Dr. Holt's opinion, that Dr. Holt's opinion was conclusory in any event, and that the ALJ properly considered the longitudinal medical record and reasonably concluded that it conflicted with Dr. Holt's medical opinion.

While an ALJ must give controlling weight to the medical opinion of a treating physician, the ALJ must do so only if the treating physician's opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with other substantial evidence." *Bauer v Astrue*, 532 F3d 606, 608 (7th Cir 2008), citing *Hofslien v Barnhart*, 439 F3d 375, 376 (7th Cir 2006). If the ALJ does not give a treating physician's opinion controlling weight, the Social Security regulations require the ALJ to consider: 1) the length, nature, and extent of the treatment relationship; 2) the frequency of examination; 3) the physician's specialty; 4) the types of tests performed; 5) and the consistency and

supportability of the physician's opinion. *Moss v Astrue*, 555 F3d 556, 561 (7th Cir 2009).

Dr. Holt's May 22, 2012 letter to Pascente stated, "It is my opinion that in your current state of health, that you are unable to obtain and maintain gainful employment with a poor prognosis at this time with the current mass of knowledge available." (AR 1100). That the ALJ did not find Pascente was in fact disabled on the basis of Dr. Holt's letter was proper. Under the Social Security regulations, the Commissioner is charged with determining the ultimate issue of disability. 20 CFR § 404.1527(e); see *Clifford v Apfel*, 227 F3d 863, 870 (7th Cir 2000) ("A claimant . . . is not entitled to disability benefits simply because a physician finds that the claimant is 'disabled' or 'unable to work'").

In giving the opinion little weight, the ALJ stated that Dr. Holt's opinion was given little weight for a number of reasons:

> Initially, during the office visit of [the date of Dr. Holt's opinion letter], there were no significant abnormalities or extreme limitations of function noted that could support this opinion. Next, there are no specific limitations outlined or referenced that would preclude all work activity, and none referred to in prior treatment notes. Further, in addition to a lack of support from clinical findings of that same date, the medical record as a whole does not support this conclusion.

(AR 32). The ALJ then provided examples from the medical record where Pascente was evaluated to have intact lower extremities, no gross instability, 5/5 strength in her quads and hamstrings, full range of motion of the elbow and wrists, gross sensory and motor otherwise intact, and an intact grip. (AR 32). The ALJ also addressed Dr. Holt's February 28, 2012 medical source statement in which he indicated that Pascente had fibromyalgia, diffuse osteoarthritis, degenerative disc disease, and rotator cuff injuries that severely limited her ability to obtain and maintain gainful employment. (AR 32, 812). The ALJ

discounted that opinion letter for the same reasons she discounted the May 22, 2012 letter. The ALJ's explanation for giving Dr. Holt's opinion little weight came after a lengthy discussion of Pascente's medical records dating back to 2008.

It is clear from the ALJ's explanation for not giving Dr. Holt's opinion controlling weight that she considered all of the factors that she was required to under the regulations. The ALJ more than minimally articulated her reasons for discounting Dr. Holt's opinion, and so the ALJ did not commit legal error by failing to give Dr. Holt's opinion controlling weight. See *Elder at* 415 (7th Cir 2008) ("If the ALJ discounts the physician's opinion after considering [the enumerated] factors, we must allow that decision to stand so long as the ALJ minimally articulated his reasons—a very deferential standard that we have, in fact, deemed lax") (internal quotations and citations omitted). Pascente is therefore not entitled to reversal on the basis of the ALJ's alleged error in discounting Dr. Holt's opinion that Pascente was disabled.

**B**

Pascente next takes issue with the ALJ's alleged reversible legal error by failing to consider the combination of her systemic disease with her severe joint degeneration. In support of her argument, Pascente cites to a January 10, 2011 CT scan of her abdomen, medical records showing that she suffers from degenerative joint disease in her knees, her shoulders, her right elbow, and her right wrist, a note from Dr. Sipe indicating in the "Subjective" portion of his notes that "She suffers from early severe arthritis," and her use of all forms of treatment available to her including pain medication, corticosteroid injections, and multiple surgeries. The Commissioner argues in response that the ALJ determined that Pascente's systemic disease and joint degeneration -

fibromyalgia, degenerative joint disease, and severe early arthritis – were severe impairments that the ALJ analyzed in detail throughout her opinion.

As the Commissioner points out, the ALJ identified the severe impairments of fibromyalgia, osteoarthritis, degenerative changes or right wrist, and status post right shoulder arthroscopy, among other severe impairments. (AR 22-23). Also as the Commissioner points out, the ALJ expressly stated that she considered Pascente's multiple severe impairments "both singly and in combination." (AR 32). The ALJ's statement that she did so is supported by the discussion in her Decision of medical records, exam results, and Pascente's subjective statements as to those severe impairments (which she herself complained of experiencing in combination at times to her doctors). Pascente points to medical records that the ALJ obviously considered, as those records were cited in her Decision. While the ALJ did not specifically cite to the CT scan results of January 10, 2011, that one omission does not equate to the ALJ failing to consider the combination of Pascente's systemic disease and severe joint degeneration. In the end, the ALJ sufficiently articulated her assessment of the evidence to assure the Court that she considered the combination of Pascente's systemic disease and severe joint degeneration.

Pascente also takes issue with the ALJ's RFC, arguing that it was inadequate and resulted in a finding that Pascente could perform work. Specifically, Pascente argues that her RFC should not have been measured by her best days and because the ALJ failed to take into consideration the significant evidence that demonstrates she has severe pain and morning stiffness that would often preclude her from making it to work. Pascente's argument regarding the ALJ's RFC dovetails with her later arguments that the ALJ failed to adequately analyze the record while assessing her credibility and erred by discounting her credibility because she performs some modified activities of daily living. These

arguments all equate to a challenge of the ALJ's findings regarding credibility. The Commissioner argues that the ALJ correctly considered Pascente's daily activities, as they are a factor relevant to a claimant's symptoms such as pain. Also, the Commissioner argues that Pascente does not argue how the records she cites compel the conclusion that she was disabled, and in citing those records, she is inadequately rehashing the medical record.

Determinations of credibility made by the ALJ will not be overturned unless the findings are patently wrong. *Shideler v Astrue*, 688 F3d 306, 310-11 (7th Cir 2012). "Only if the trier of fact grounds his credibility finding in an observation or argument that is unreasonable or unsupported . . . can the finding be reversed." *Sims v Barnhart*, 442 F3d 536, 538 (7th Cir 2006) (citation omitted). SSR 96–7p instructs that when "determining the credibility of the individual's statements, the adjudicator must consider the entire case record," and that a credibility determination "must contain specific reasons for the finding on credibility, supported by the evidence in the case record." An ALJ should consider elements such as objective medical evidence of the claimant's impairments, the daily activities, allegations of pain and other aggravating factors, "functional limitations," and treatment (including medication). *Scheck v Barnhart*, 357 F3d 697, 703 (7th Cir 2004); *Rice v Barnhart*, 384 F3d 363, 371 (7th Cir 2004). "Without an adequate explanation, neither the applicant nor subsequent reviewers will have a fair sense of how the applicant's testimony is weighed." *Steele v Barnhart*, 290 F3d 936, 942 (7th Cir 2002).

Here, the ALJ considered the entirety of the case record, as is evident from her Decision. The Decision includes a recitation of Pascente's medical records. It includes a recitation of Pascente's testimony regarding her daily activities, her pain, and the treatment she received for her pain and impairments. The Decision includes a recitation of Pascente's statements (and omission of statements) made

to doctors regarding her pain and impairments and, at times, what kinds of activities she engaged in. While Pascente alleges the ALJ's failure to recognize cardiac palpitations Pascente reported on June 10, 2011 following 4 cortisone shots in short succession for her arthritis pain, the ALJ discussed instances where Pascente herself asked for injections to help the pain. The ALJ also cited a medical record from June 10, 2011 which provided, "Pt comfortable with this being due to steroids. She was concerned because she never had 4 shots so close together, and the symptoms are a bit longer than usual, but exactly the same quality." (AR 834). The ALJ discussed how Dr. Sipe noted that Pascente may be able to do more after knee replacement surgery, but that no specific limitations were outlined in that medical record. (AR 29). See *Arnold v Barnhart*, 473 F3d 816, 822 (7th Cir 2007) ("Although a claimant can establish the severity of his symptoms by his own testimony, his subjective complaints need not be accepted insofar as they clash with other, objective medical evidence in the record").

The ALJ articulated that while Pascente's range of motion, strength, and sensation were largely intact, she presented with some objective findings and thus had been limited to a restricted range of sedentary work. (AR 32). The ALJ discussed her reason for restricting Pascente to a sedentary rather than light range of work, even where Dr. Sipe restricted Pascente to light duties as to her wrist when Pascente presented with wrist pain in December 2011. (AR 32). The ALJ discussed how she limited Pascente to less lifting and carrying and less standing and walking than called for by PA Saylor in his medical assessment of Pascente's ability to perform work-related activities. (AR 33). The ALJ also discussed why she did not impose a limitation of exposure to humidity and wetness, which PA Saylor indicated, as the necessity of such was unsupported in the objective record. (AR 33). As for Pascente's obesity, the ALJ noted that there was an absence of medical opinions addressing the impact of Pascente's obesity

on her other impairments and any attendant functional abilities, but the ALJ nevertheless found that Pascente's obesity "clearly has an impact on her functionality, but does not impact this functionality beyond the residual functional capacity assessment set forth [earlier in the written Decision]." (AR 33).

In light of the exhaustive discussion of the entire case record and ALJ's discussion of how and why she weighed the evidence, particularly as it pertained to Pascente's credibility, the Court is able to see how Pascente's testimony was weighed. Moreover, the ALJ's discussion (detailed above) of her reasons for why she rejected the Dr. Holt's opinion identifies, in part, the substantial evidence that supports her credibility findings. Substantial evidence supports the ALJ's credibility determinations. Accordingly, the ALJ did not err in finding that Pascente could perform work based upon the RFC the ALJ found, given that the ALJ was "required only to incorporate into [her] hypotheticals those impairments and limitations that [s]he accept[ed] as credible." *Simila v Astrue*, 573 F3d 503, 521 (7th Cir 2009). Finally, the Commissioner correctly states that much of Pascente's challenge to the ALJ's Decision is simply an inadequate rehashing of the medical records.

## V

As detailed above, the ALJ's Decision in this matter is supported by substantial evidence, and that evidence was sufficiently articulated by the ALJ in order for the Court to determine that the important evidence was considered and to trace the path of the ALJ's reasoning.

For the reasons set forth above, the Court recommends that the Plaintiff's Motion for Summary Judgment (Doc. 13) be DENIED and the Commissioner's Motion for Summary Affirmance (Doc. 16) be GRANTED.

The parties are advised that any objection to this Report and Recommendation must be filed in writing with the Clerk within fourteen (14) working days after service of this Report and Recommendation. FRCP 72(b)(2); 28 USC § 636(b)(1). Failure to object will constitute a waiver of objections on appeal. *Johnson v Zema Systems Corp*, 170 F3d 734, 739 (7th Cir 1999); Lorentzen v Anderson Pest Control, 64 F3d 327, 330 (7th Cir 1995).

Entered on February 20, 2015.


s/Jonathan E. Hawley
U.S. MAGISTRATE JUDGE